We'll hear the next case, United States v. Johnny Morgan. Good morning, and may it please the court. My name is Daniel Addis. I'm an attorney at the Legal Aid Society DNA unit. By motion to this court, Mr. Palma asked that I argue the DNA issue. I'm going to reserve two minutes of my time. Mr. Palma is going to use two minutes of his time to discuss the 9-1-1 issue, and I'll continue with the balance of time after the government's argument. Every technology has its limits. The OCME repeatedly stated prior to the Daubert hearing in this case that the lower limit of their low copy number technology was 20 picograms. And we are here today because the district court determined that there are, in fact, no limits to DNA technology, contrary to the weight of all of the evidence before him. Well, that's not just their decision, is it? I mean, this was a validated study. The Committee on Forensic Science had approved. There's more to it than that. That's not just the district court in the face of contrary science totally just deciding on its own that this is valid. As to general validity, no. However, the statements of the subcommittee when the technology was approved included a lower limit of 20 picograms. But that wasn't a statement that at no time could technology be developed that would authoritatively do DNA matching below that level. It's not that it's a... Because we're looking at a spectrum of quantities on which similar techniques are used. And the question is, at what time is so much error introduced that it's not reliable enough to be used in a courtroom? Isn't that right? I think it is more or less right in that nobody has said that at no time will DNA technology not be able to break that level. But that's not the question, I think, under Emergianos. The question is whether the data that the OCME relied upon in forming their opinion as to the decision they made in this particular case was sufficient to say they could go below that level. And all of their indications previously were that they couldn't, that below 20 picograms, the measure that they use in order to distinguish a major contributor to a mixture is peak heights, and that those are not reliable below 20 picograms. It's included in their papers. It's included in multiple statements to the New York Commission on Forensic Science. Every single statement they made before the DNA subject... But you're not challenging, then, low-copy analysis. Generically, you're saying it's applied in this case because there was just a 6-picogram sample, it's unreliable, and it was an abuse of discretion to admit it. Is that right? I think there are a lot of arguments that there is disagreement in the scientific community about low-copy number testing generally. I don't think the court has to go that far in order to resolve this particular case in favor of Mr. Morgan. And it's a 14-picogram sample. And the issue is that they simply never... It's 14 here, right? 14 here, a 14.2-picogram degraded three-person mixture. Now, there was some indication that... You know for sure it was a three-person mixture? No, and that's part of the problem. Part of the problem is that they can't even tell at those levels whether they're looking at a two-person mixture or a three-person mixture. But the conservative perspective to take in a situation like that is that if you don't know, you shouldn't be analyzing something with tools that you only derive for a two-person mixture, especially when you're conceding that additional contributors to the mixture is going to make it more difficult to distinguish between them. Do I understand you to be saying that you're not challenging LCN DNA testing generally but just how it was applied in this case? I think that there's significant questions to the reliability of low-copy number testing generally. But I don't think that that necessarily has to be the primary issue before this court. Well, you're arguing for this client. You're not arguing for the cause here. Your cause may be advantaged by a more general argument, but you're arguing here for your client and it was misapplied in this case, aren't you? I think it is perfectly clear that it was misapplied in this case. I think there's substantive doubts about its viability, including the letter that we submitted to the court in our motion to expand the record, which suggests that even between 20 and 37.5 picograms, they're not getting reliable results. But since time is short, could you address the standard of review? Sure. So there's the recent Collins decision, which applied a Frye standard, which is a generally accepted kind of scientific reliability, I guess, or generally accepted scientifically. But here we have a much, much broader standard in which the district court is a gatekeeper and looks for, you know, reasonable reliability. And, you know, this is an exercise of discretion that we defer to generally. The district court here wrote a lengthy opinion and studied and heard, you know, after hearing from experts of various stripes. Why don't we have to defer to that? What is so manifestly unreasonable about it? I think there were a few manifest errors. One was that, as I opened with, it indicated that there's no limit to the technology despite statements by OCME to the contrary. The court gave short shrift to the fact that they have no data to support their ability to go down to that level, no data to support their ability to go down to three-person mixtures, no data to support their ability to interpret mixtures that show clear signs of degradation. And in doing so, he deferred to the DNA subcommittee. He said they took a look at this and they haven't told OCME to stop. It's actually not what they technically said, and they specifically declined to address whether OCME's validation supports their ability. Aren't there numerous cases that have accepted the LCN testing, including internationally? There are cases where it's been admitted. There are cases where it's been precluded, including a federal case in New Mexico where it was not admitted. I guess, for me, the question is, the district court isn't deciding whether I accept the conclusion. The question is whether it's sufficiently reliable, sufficiently relevant to be put to the jury, and then the defendant is entitled to cross-examine, attack it, present its own expert. And so this goes to Judge Carney's question. It's really, why is there an abuse here? The abuse is that all of their data, their papers that they submitted, their statements to the DNA subcommittee, shows that they can't go to this level. If the court takes a look at the record that they submitted, when you go below 25 picograms, when you get to 12.5 and 6.25, and then, on top of that, ask them to start interpreting mixtures based on that unreliable data, they even say they can't do it. There are numerous statements that peak heights become unreliable at that level. You would say it's their burden to support its use. Absolutely. And that the peer-reviewed, the one peer-reviewed article, and the lab validation studies and so on, none of them went to 6 picograms, or 6, but we have a sample of 14. Did any go to 14? Well, their single-source samples went down to 6.25, but if you actually look at what they show, they show quite a bit of unreliability, especially with respect to peak heights. And peak heights are the way you distinguish between contributors to a mixture. And all of their data supports a conclusion that they simply can't do that, including their own statements. And that's really the biggest manifest error that the court made, is it said, I'm going to set aside OCME's own conclusions about how low they can go. Now, Dr. O'Connor did testify that the lower limit was 5 picograms, but there's no support in any of their studies or any of their papers or any of conclusions about their studies as to why they say 5 picograms. Thank you. We'll hear from your colleague. Good morning. May it please the Court. My name is Richard Palma. I'm CJA. I'm the appellant for Mr. Morgan. The district court abused its discretion over the defense objection to testimony of two police officers about why they went to the particular scene. They were permitted to say, man with a gun. Now, this is an abuse of discretion, not because the court did not understand the balancing test under FRE 403. It certainly did understand that. But it abused its discretion because it did not know how to assess the evidence, the statement, man with a gun, and how the government was going to use it at the trial. What about the limiting instruction? Well, even the court says, and that gets to my point, the court says, even if they ignore my limiting instruction, and this goes to the point that it didn't understand, assess this correctly, this evidence is arguably, the probative value is arguably modest, and it also says the defendant is not directly implicated. What undermines that is the government's summation, where it says in three particular spots in the appendix, at 821-57, 821-67, and 821-6970, three times the government says 1 plus 1 equals Johnny Morgan. They went to the location because a man with a gun, and they say, and who is the person at the location? Johnny Morgan. There were three eyewitnesses who saw Mr. Morgan brandishing a gun, too. That's part of the equation. That's what they should have argued. They should have argued that, that at the bar, at a different location, people who worked at the bar saw him with the gun. They shouldn't have been permitted to then say, well, we went to a different location where there's a 911 call explaining. The reason why, the government said, we want this only for background. We just want to explain why the police were there. We didn't want it for the purpose of trying to show a link between that call, which would put the gun in his hand, and Mr. Morgan, and that's how they used it. Thank you. Thank you. We'll hear from the government. Good morning. May it please the Court. My name is Robert Allen. I'm an Assistant United States Attorney in the Southern District of New York, and I represent the government on appeal, and I also represented the government in the trial below. I want to start with a couple of issues on the DNA, although I'm, of course, happy to answer questions on the hearsay statements issue. The question before this Court is not whether LCN technology is reliable. The question before this Court is whether Judge Morero properly exercised his discretion in finding, based on the record before him at that time, which was extensive, that the government's proposed evidence could be admitted. The primary defense argument appears to be that OCME itself had established a 20-picogram lower limit and that the district court committed an error by saying that there was, in fact, no lower limit. And I want to be very clear that that is based on a misreading of the record and that the record is actually fairly clear to the contrary and that Judge Morero's conclusion was very supported. Could you please focus on, though, the argument that a 14.2-picogram sample was smaller than what had been validated by the lab and smaller than what had been confirmed in peer-reviewed publications as an inadequate basis for conducting LCN analysis, particularly where the number of contributors is unknown? Well, Your Honor, the number of contributors was not unknown. There was testimony that it was a two-contributor sample. Is that something that one can know, except through doing the analysis? Yes, and Dr. O'Connor testified in the Daubert hearing that you can determine the number of contributors to a sample by measuring the differences in the peak height, in other words, by looking at the differences in the... You're still interpreting data from the DNA sample itself? That's correct. And you're making judgments about whether it was likely one, likely two, or three? That's right, and those judgments were informed by an extensive two-year validation study that OCME performed. On a sample of this size? On samples of many different sizes. Including this size? So 800 different samples were analyzed. There were single-source samples that were analyzed down to 6.25 picograms, which is less than half of the size of this sample. No, but we're not talking about single-source samples. They're samples where there's an unknown number of contributors. Well, again, Your Honor... Because my understanding is it's the interplay, in part, that introduces ambiguity into the results. So I'm looking for what exactly there is in the record that confirms from a scientific point of view the analyzability and reliability of a sample of this size. So in addition to the single-source samples, there were also included in the validation studies samples that were mixtures of different ratios. So in other words, one-to-one, so two people with an equal amount of DNA contributed, three-to-one, and then five-to-one. And those mixture samples were conducted at sizes of 100 picograms, 50 picograms, and 25 picograms. The mixture studies did not go to 14, but there's no reason that the same principles and the same guidelines cannot be applied to interpret a 14-picogram mixture. And that is, in fact, what the DNA subcommittee, which is composed of experts in the field, concluded. And what my colleague misses is that after the Daubert hearing, the defendant actually moved to reopen the record, and Judge Morillo allowed that request. And the basis for reopening the record was that the DNA subcommittee had never approved tests on mixtures below 20 picograms, so the same argument they're making here. The government then submitted a letter from the DNA subcommittee that said, in fact, we had approved it below that level. And Mr. Morgan's lawyer then actually made a presentation to the DNA subcommittee arguing the same points that are being made before this court today. And the DNA subcommittee, again, rejected that argument. And this is a body that is composed of experts in the field disagreeing with the very argument that Mr. Morgan is now making. That's not included in the appendix, but it's referenced in a documentary. Remind me, did they say how far down they did approve? They said that there was no lower limit on the amount of DNA that could be tested pursuant to the guidelines OCME had created, so long as, in fact, DNA was, you know, recovered in a sufficient amount to actually analyze. But I wasn't clear whether that was kind of a general statement about, you know, theoretical possibilities or whether they validated the lab techniques for samples without any minimum amount. So it may help to explain how the guidelines actually work. In essence, LCN testing is a form of DNA testing that is subject to increased stochastic effects, or in other words, just increased randomness. The way the guidelines work... Again, just for context, though, it's not used anywhere else in the country, right? And not by the FBI. It's only in New York that it has been used. Is that correct? That's not quite correct. It's used all over the country for non-forensic applications. So, for example, missing persons analysis and various medical tests. It is used in other countries, and it is also... Anywhere else in the United States for forensic applications? It is used in some other states, and OCME actually does for-fee testing for other states. So, in other words, there have been some instances where other states have hired OCME to do it. Has OCME discontinued it now, as I understand, from the supplemental materials? So the supplemental materials, which, again, to focus the court... The question here is whether the decision that Judge Mirra made was correct on the record before it. A subsequent decision by OCME is obviously not relevant to that question. But OCME has apparently discontinued the use of LCN technology, which, and by the way, LCN, the validation studies here occurred in 2003 and 2004, were approved by the DNA Subcommittee in 2005, and testing began in 2006. So to say that they've now moved on to a different technology a decade later should not be particularly surprising. But the reason that OCME no longer does it is because they now have found basically a high-copy number testing kit that can go down to around 20 picograms, and they basically said, you know, if you look at all the tests we've done, that captures the vast majority of them. And so there's no reason to have a separate group of people dedicated to doing it. So no suggestion that the LCN was unreliable in any way? Quite the contrary. We've conferred with OCME, and that's not the case. It's simply that their lab will use one kit, it's more efficient, and it captures the vast majority of what LCN had previously been designed to get, and so there was no need to have two different lab setups. Essentially what you're saying is it was an administrative decision. Yeah, it's just because in the decade since LCN technology has been in use, there is now a new kit that can capture most of the same data in an easier fashion. And to turn back to the sample size and what kind of validation and authorization there was to do this kind of LCN on a 14.2 sample size with unknown number of contributors, you're saying that that was presented to the DNA subcommittee, the forensic unit, I forget their exact title, and they expressed no concerns. That's correct, and in fact it was presented to the DNA subcommittee by Mr. Morgan's own lawyer, and it was rejected. And again, the reason why is because the guidelines that OCME creates for the interpretation of DNA results are basically a way to eliminate statistical randomness. So in essence, LCN testing is done three times. It's done three times so you can get a greater look at sort of the underlying DNA profile. And then the guidelines say only look at what is core, in other words what appears to be the most robust results in those three different iterations of the test. The guidelines accordingly, since it's almost more of a statistical function than it is a purely measurement or scientific based, can apply whether the size of the sample is lower than 25 picograms or not. There are guidelines that are created based on the single source samples and based on the mixture samples, but they're not directly tied and they don't have to be directly derived from a test of precisely the sample at issue here, and that's what Judge Marrero found. The LCN testing is really just an extension of the high copy. In other words, it's everything the same except they need to do a few more of the samples. Yeah, there are basically four steps to any DNA test. First you get the sample and you extract the DNA, so you put it in some chemicals that break open the cells and get rid of everything else. You then quantify the DNA, figure out how much there is. You then amplify the DNA, and that just basically means you put it into a chemical soup that causes it to replicate itself, so you have more of it to measure. You're growing more of it. You're growing more of it. In high copy number or standard DNA testing, you have 28 replication cycles, and in low copy number you have 31 replication cycles. Oh, replication cycles each time you're growing? That's correct. 28 versus 31 new growths. You turn the heat up and it starts replicating, and then you turn the heat down and it stops, and that is one cycle. But doesn't it seem that each of those cycles introduces the possibility for more errors? Well, each cycle certainly introduces the possibility for more randomness and stochastic effects, and that's why OCME spent two years developing guidelines to eliminate that extra randomness and focus only on the most robust results. And here, Your Honor, would note that the profile here is a 1 in 1.43 million profile, which is not nearly as robust as a traditional DNA match might be, which are oftentimes 1 in a billion or so. And, Your Honor, if I could just make one point. What should we take from the fact that no other state in the United States and the FBI have adopted this technique during the relevant time period? There are various reasons why the FBI and other states might not have adopted and used LCN technology. It's, frankly, not used in a ton of cases, because oftentimes if you have blood, if you have saliva, if you have a bodily fluid, you get a ton of DNA, and so you just don't need it. That the FBI and that other entities have decided it's not worth the funds to conduct a validation study is a decision that they can reasonably make, but it doesn't speak to the studies that OCME itself did conduct. And although this was not part of the Daubert record, the defense actually called an FBI geneticist during Mr. Morgan's trial, and that geneticist testified and said the reasons why the FBI didn't do the test and that the FBI did not do the particular test. And that goes to show that what we have here really was properly handled by the courts below. Is it also correct, though, that whether there had been peer-reviewed publication related to the LCN technique, there was such peer review, but it was in one single Croatian medical journal, a forensic medical journal, and nothing in the United States. Is that right, or was there something more that I missed? So it was peer-reviewed in a number of ways. There was the Croatian journal, which there was testimony in. The Daubert hearing is actually an important journal in the field of genetics. There are other articles about the science generally, so it's not something that was just invented randomly. There was literature that was included in our briefs below about LCN technology. It was also, of course, peer-reviewed by the DNA subcommittee of the New York Commission on Forensic Science, which is a group of experts in the field, and, again, they approved the technology. In terms of peer-reviewed publication, it's that one publication. In terms of publication, the actual studies here, the validation studies, were published in the Croatian medical journal. But, again, the testimony was that that's an important journal in the field. And, again, this is not some crazy new science or a radical new test that people can conduct. It is a change to an existing test that allows for the review of results at lower levels. You had one more point you wanted to make, you said? If I could just add one point, it's that it's sort of an odd objection to this test because the errors, the stochastic effects of DNA testing are actually far more likely to exonerate a defendant than to convict them. In other words, if it is true that you find random results in a DNA test, you would think that that random allele that was found would prevent a match from occurring. And the evidence in this case, the three eyewitnesses, the officer who saw Mr. Morgan make a throwing motion and recovered a gun in that same area shortly thereafter, all that evidence shows that this test did exactly what it was supposed to do, which is that it worked. It proved that Mr. Morgan had, in fact, possessed a gun. And, you know, had there truly been stochastic effects, it would have exonerated Mr. Morgan. It would have suggested that he was not the person who had the gun rather than the opposite. Thank you. I just want to correct the last thing that my colleague stated. Every single time an allele disappears from a mixture is an opportunity for an innocent person to be exonerated. We do have in this case the three eyewitnesses, the testimony of the law enforcement officers who saw Mr. Morgan toss something. We have the recovery of the gun. We have the recovery of shells. In other words, it's not just the DNA evidence. No, but all that evidence led to a mistrial. And the only difference between the first trial and the second trial was the DNA evidence. So the jury hung as to the first trial. And so this was clearly a crucial piece of evidence. The other issue that I wanted to take up was that the DNA committee did not conclude that OCME's validation data could go below the 20-picogram limit. In fact, the district court correctly described their decision not to address that question. They didn't want to act like a Daubert court. They specifically deferred on the question of whether their validation supports going below 20 picograms. And I think the manifest error that's clear in this case is in a way that the district court acted more like a Frye court than a Daubert court by deferring to the DNA subcommittee on the issue of reliability because, as Mark Giannos teaches us, the court has to look into the basis for the conclusions that the scientist has made and cannot rely on the ipse dixit of the expert, which comes from Joyner. But it's pretty clear that in this particular case, that's not what the district court did. The district court said, well, the DNA subcommittee said it's okay, despite OCME's indications that its limits are 20 picograms, despite the fact that this technology isn't used anywhere else. We also have to remember that everywhere else the limit is 100 picograms. And in answer to Judge Chin's question about whether this is really just an extension of the same test, the problem is that it's an extension of the same methods, but that's when the limit is set because that's the point of unreliability. And they spent two years determining what that point of unreliability was, and it was 20 picograms. And so they can't just simply discard all of the testing that proves that they shouldn't do precisely what they did in this case. Thank you. We'll reserve.